# United States District Court
# Northern District of Indiana
# Hammond Division

| | | |
|---|---|---|
| NANCY SPEBAR, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:08-CV-83 JVB |
| | ) | |
| CITY OF HAMMOND, BRIAN MILLER, | ) | |
| and RICHARD TUMIDALSKY | ) | |
| | ) | |
| Defendants. | ) | |

**OPINION AND ORDER**

On March 13, 2006, the City of Hammond police officers, broke into the house of Plaintiff Nancy Spebar without a warrant following a 911 report that a local boy was missing and was believed to have been taken by Plaintiff. Plaintiff was then forcibly removed, handcuffed, and placed in the backseat of a police car. After a thirty minute detention, during which time the officers searched Plaintiff's home, Plaintiff was informed that the boy had been found at a neighbor's house. Following these events, Plaintiff filed a claim with this Court, alleging violations of her Fourth and Fourteenth Amendment rights by all Defendants. The Defendants filed Motions for Summary Judgment which are now before this Court.

**A.      Standard of Review**

Summary judgment must be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment is also appropriate if, after adequate

time for discovery, the opposing party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The filing party bears the burden of establishing the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. If the moving party meets this burden, the responsibility shifts to the non-moving party to show that an issue of material fact exists. *Keri v. Bd. of Trust. of Purdue Univ.*, 458 F.3d 620, 628 (7th Cir. 2006). It is not the function of the court to "scour the record in search of evidence to defeat a motion of summary judgement;" instead, it is the nonmoving party's burden to identify the evidence upon which its case is based. *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996).

When deciding the motion for summary judgment, the court will accept the facts presented by the moving party as undisputed, except for those controverted by the opposing party. 7th Cir R. 56.1(b). All facts, however, must be viewed in a light most favorable to the non-moving party and all legitimate inferences must be drawn and all doubts resolved in favor of that party. *Keri*, 458 F.3d at 628. A court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *Anderson v. Liberty Lobby*, 477 U.S. 242, 249–50 (1986). A "mere . . . scintilla of evidence" will not be sufficient to support the Plaintiff's claim, the court must find "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. "Only disputes over facts that might affect the outcome of the suit

under the governing law will properly preclude the entry of summary judgment." *Id*. at 248.

B.   **Background and Facts**

As required, the Court construes all material facts in the light most favorable to Plaintiff and draws all reasonable inferences in her favor. *Miller v. Herman*, 600 F.3d 726, 733 (7th Cir. 2010). They are as follows:

On the morning of March 13, 2006, Plaintiff, a resident of 626 Steward Court in Hammond, Indiana, was in her home changing in preparation for an appointment with her accountant. (DE 35, Pl.'s Resp. 3.) While in her bathroom, Plaintiff heard glass breaking in her house and, fearing someone was breaking into her home, moved to the hallway and called 911. (DE 35, Pl.'s Resp. 3–4.) The dispatcher informed her that it was the police at her backdoor and that she should go to meet them. (DE 35, Pl.'s Resp 4.)

Unbeknownst to Plaintiff, Trina Cox, who was visiting her Grandmother at 634 Steward Court, had called 911 following the disappearance of her five-year-old son, Jordan Cox. (DE 35-6, Tr. of Audio Compact CD 10/8:3–4, 18.) Ms. Cox had left the boy outside unattended to use the bathroom and upon return could not find him. (DE 27-1, Cox Dep. 13:12–15.) Ms. Cox reported to the operator that she thought Plaintiff, whom she identified as a schizophrenic woman living two houses down, had taken her son. (DE 35-6, Tr. Of Audio Compact CD 10/8:14–15; 3:1.) She further stated that Plaintiff had "been locked up and stuff and she was out throwing bricks at the pole and she told me she told Jordan to get out of here there's no telling what she did to my kid." (DE 35-6, Tr. of Audio Compact CD 20/8:3–5.) After insisting that Jordan was in Plaintiff's house, Ms. Cox told the operator that Plaintiff admitted chasing Jordan

3

away from her yard (DE 35-6, Tr. of Audio Compact CD 20/8:11, 15–16.)

Plaintiff asserts that earlier that morning she had been in her front yard reattaching her gutter drain, not throwing bricks, and that she had politely asked the boy to leave her property. (DE 35, Pl.'s Resp. 3.) He exited through the backyard, which Plaintiff claims she reported to Ms. Cox—whom Plaintiff had not met before that day—and her grandmother when they came inquiring about him after his disappearance. (DE 35, Pl.'s Resp. 3; DE 35-2, Spebar Dep. 17:3–5.) Ms. Cox contradicts this claim, however, insisting that Plaintiff stated she had "chased his ass into the alley." (DE 27-1, Cox Dep. 16:18.) Therefore, after searching the alleys for Jordan, Ms. Cox suspicion turned to Plaintiff, the last person to have seen him. (DE 27-1, Cox Dep. 22: 17–19.) She claims she attempted to get Plaintiff to come to her door and talk to her, but to no avail. (DE 27, Cox Dep. 25:9–13.)

While on the phone with the operator, Ms. Cox claimed she returned to Plaintiff's door and knocked again, but received no response from within. (DE 35-6, Tr. of Audio Compact CD 30/8:4.) Ms. Cox continued to claim Plaintiff was crazy, schizophrenic, and a nut. (DE 35-6, Tr. of Audio Compact CD 20/8:1, 3, 15.)

The Operator then radioed available officers stating: "We've got a missing 5 year old . . . . Caller states she believes her 10-96[1] neighbor that lives at 636 took her child. That 10-96 neighbor is supposed to be schizophrenic and she's threatening her son." (DE 35-6, Tr. of Audio Compact CD 30/8:25–28.) Sergeant Richard Tumidalsky, an on-duty City of Hammond police officer, was the first to arrive at Plaintiff's house. (DE 27-3, Tumidalsky Dep. 15:24–25, 24:8–10) Once there, Tumidalsky found Ms. Cox, now hysterical, standing by Plaintiff's home.

---

[1]The number "10-96" refers to a mentally impaired person.

(DE 27-3, Tumidalsky Dep. 18:5–6.) She reasserted her belief to Tumidalsky that her son was inside Plaintiff's home and told him she couldn't get Plaintiff to answer her door. (DE 27-3, Tumidalsky Dep. 18:8–12.) She also told the officer that Plaintiff had threatened her son and had been throwing bricks around the yard. (DE 27-3, Tumidalsky Dep. 18:8–12.)

When his attempts to calm Ms. Cox failed, Tumidalsky began knocking on the side door of Plaintiff's house while announcing himself as a Hammond police officer. (DE 27-3, Tumidalsky Dep. 19:6–10, 20:4–5.) For three to four minutes, Tumidalsky knocked on the side door, front door, and front windows but received no response from inside. (DE 27-3, Tumidalsky Dep. 20:9–25.)

By this time, other officers had arrived. (DE 27-3, Tumidalsky Dep. 22:7.) Tumidalsky, who was now the officer in charge at the scene, attempted to call Plaintiff's home but was unable to get the number. (DE 27-3, Tumidalsky Dep. 22:3–5.) Ms. Cox followed the officers and continued to insist that her son was inside. (DE 27-3, Tumidalsky Dep. 22:16–17.) Tumidalsky then contacted dispatch and informed them that he believed they would need to enter the home. (DE 27-3, Tumidalsky Dep. 22:19–21.) After receiving the approval to enter the house by force from his offsite senior supervisor Sergeant Thomas Stravaby, Tumidalsky knocked and announced himself for three additional minutes still receiving no response.(DE 27-5, Strabavy Dep. 12:1–2; DE 27-3, Tumidalsky Dep. 28:9–11.) Plaintiff asserts that she did not hear any knocking. (DE 35-2, Spebar Dep. 54: 23–25.) Without a warrant, Tumidalsky attempted to gain entry by breaking the glass pane in the doors with his flashlight. (DE 27-3, Tumidalsky Dep. 28: 13–15, 19–20.) However, the door was locked with a deadbolt and it was ultimately necessary to kick the door open in order to enter. (DE 27-3, Tumidalsky Dep. 29: 2–12.) The dispatcher

notified the officers that Plaintiff had called 911 and knew that they were entering her house. (DE 28, Tumidalsky's Br. 5.)

At this time, Plaintiff had gone to her bedroom to finish changing and then walked to the kitchen where she met two policemen, Tumidalsky and Officer Gutierrez, already inside her home. (DE 35-2, Spebar Dep. 68:3–18; DE 27-3, Tumidalsky Dep. 31:7–11.) Tumidalsky told Plaintiff that they were looking for a boy and she informed him that "[t]here is no boy in the house." (DE 35-2, Spebar Dep. 70:6–7.) When Tumidalsky said they needed to search the home, Plaintiff told they could not enter without a search warrant. (DE 35-2, Spebar Dep. 71:11–12.)

The police officers then asked Plaintiff to step outside. (DE 35, Pl.'s Resp. 4.) Without becoming hostile or resisting the police in any way, Plaintiff agreed to but asked to be allowed to get her shoes first since she was only wearing socks. (DE 35, Pl.'s Resp. 4.) While looking for her shoes, Plaintiff was abruptly and forcibly removed by two officers (Plaintiff has not identified them) down the steps, outside the door, and thrown face-down on the ground. (DE 35-2, Spebar Dep. 83:6–21.) She was then handcuffed—during which time someone put either a knee or arm in her back—and then lifted to her feet, and put in a police car. (DE 35-2, Spebar Dep. 84:3–4, 86:10–11.) Tumidalsky asserts that his contact with Plaintiff was limited to him placing his hands on her shoulders and passing her to another officer. (DE 35-3, Tumidalsky Dep. 36:8–14.) Plaintiff could not identify which police officers touched her, but the encounter knocked her out of breath and resulted in soreness in her left arm. (DE 29-2, Spebar Dep. 105: 17–21, 88:16,19.) She remained in the police car for about thirty minutes, during which time, police officers searched her home and determined that the boy was not inside. (DE 35-2, Spebar Dep. 100:24–101:2; DE 27-3, Tumidalsky Dep. 38:17–40:5.) Then one of the police officers

returned to ask for permission to search the trunk of her car. (DE 35-2, Spebar Dep. 101:3–8.) When returning from her house with her car keys, the police informed Plaintiff that the boy had been found. (DE 35-2, Spebar Dep. 101:22–102:1.)

The Chief of Police, Brian Miller, was never on the scene during the incident and had no personal involvement with the events at the time that they took place. (DE 29-6, Miller Dep. 12:24–13:4.) He first learned of the matter in a report submitted by Tumidalsky after the fact. (DE 29-6, Miller Dep. 13:20–23.)

**C.     Analysis**

**(1)     *Section 1983 Standard***

Pursuant to 42 U.S.C. § 1983, Plaintiff alleges violations of her rights guaranteed by the Fourth and Fourteenth Amendment. Section 1983 provides "a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *City of Monterrey v. Del Monte Dunes at Monterrey, Ltd.*, 526 U.S. 687 n.9 (1999). A cause of action may be brought under § 1983 against "[e]very person who, under color of statute, ordinance, regulation, custom or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction therefor to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws."

The plaintiff must demonstrate that the defendant personally participated in or directly caused the deprivation of his or her rights. *Alejo v. Heller*, 328 F.3d 930, 936 (7th Cir. 2003). The doctrine of *respondeat superior* cannot be used under § 1983 to create liability for supervisors due to the misconduct of subordinates. *Chavez v. Ill. State Police*, 251 F.3d 612, 651

(7th Cir. 2001). Instead, the plaintiff must demonstrate that the defendant was personally responsible by "act[ing] or fail[ing] to act with a deliberate or reckless disregard of plaintiff's constitutional rights," or that "the conduct causing the constitutional deprivation occur[red] at [the defendant's] direction or with [the defendant's] knowledge or consent." *Crowder v. Lash*, 687 F.2d 996, 1005 (7th Cir. 1982).

Qualified immunity, a primary defense to a claim under § 1983, shields officers from liability when they are "performing discretionary functions . . . insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "[T]he inquiry focuses on the objective legal reasonableness of the action, not the state of mind or good faith of the officials in question." *Delaney v DeTella*, 256 F.3d 679, 686 (7th Cir. 2001). Qualified immunity provides "protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). "[P]laintiff bears the burden of showing the existence of the allegedly clearly established constitutional rights." *Clash v. Beatty*, 77 F.3d 1045, 1047 (7th Cir. 1996).

"[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom . . . inflicts the injury that the government is responsible under § 1983." *Monell v. Dep't of Soc. Services of City of N.Y.*, 436 U.S. 658, 694 (1979). A municipality will only be held liable when its official policy or practice causes a constitutional violation. *Hirsch v. Burke*, 40 F.3d 900, 904 (7th Cir. 1994). Accordingly, a plaintiff must show:

> (1) an express policy that, when enforced, causes a constitutional deprivation (2) a widespread practice that, although not authorized by written law or express

municipal policy, is permanent and well settled as to constitute a custom or usage with the force of law; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority.

*Phelan v. Cook County*, 463 F.3d 773, 789 (7th Cir. 2006).

**(2)** *Liability of Brian Miller, police chief of the City of Hammond*

Plaintiff has presented no evidence that Miller was responsible for, or even aware of, the events that transpired on March 13, 2006. Instead, Plaintiff has failed to dispute the evidence that Miller was first appraised of the incident only after its completion, when Tumidalsky submitted his report. Without showing that Miller was involved or knew of and condoned the events, Plaintiff cannot support a claim of personal liability against him.

**(3)** *Liability of Sergeant Richard Tumidalsky*

Plaintiff alleges multiple claims against Tumidalsky under the Fourth and Fourteenth Amendments including unlawful entry, search, seizure, and use of excessive force. Tumidalsky contends that, though he did not have a search warrant, exigent circumstances justified the forced entry and resulting search. Tumidalsky denies the use of excessive force and insists that Plaintiff was merely detained, not arrested, to ensure that the officers could safely search the premises. In the alternative, Tumidalsky insists that he is entitled to qualified immunity.

(a) *Officers' Entry*

Under most circumstances, the Fourth Amendment, which protects the right of the people

to be free from unreasonable searches and seizures, requires that the police obtain a warrant before entering a home. "Searches and seizures inside a home without a warrant are presumptively unreasonable." *Mich. v. Fisher,* 130 S.Ct. 546, 548 (2009) (quoting *Groh v. Ramirez*, 540 U.S. 551, 559 (2004)). This presumption can be overcome, however, when "probable cause and exigent circumstances create a compelling need for official action and [there is] insufficient time to secure a warrant." *United States v. Rivera*, 248 F.3d 677, 680 (7th Cir. 2001).

Exigent circumstances justifying warrantless entry include situations where the police or persons inside or outside the home are at risk of danger. *Minn. v. Olson*, 495 U.S. 91, 100 (1990). Officers are allowed to make "warrantless entries and searches when they reasonably believe a person within is in need of immediate aid." *Mincey v. Ariz.*, 437 U.S. 385, 392 (1978). The officer must have an objectively reasonable belief such that "the circumstances as they appeared at the moment of entry would lead a reasonable, experienced law enforcement officer to believe that someone inside . . . required immediate assistance." *United States v. Arch*, 7 F.3d 1300, 1304 (7th Cir. 1993). The government bears the heavy burden of establishing the reasonableness of the officer's belief. *United States v. Robles*, 37 F.3d 1260, 1263 (7th Cir. 1994). Courts should consider the magnitude of the urgency as well as the means used to conduct the search. *United States v. Bell,* 500 F.3d 609, 613–14 (7th Cir. 2007); *United States v. Gwinn*, 219 F.3d 326, 335 (4th Cir. 2000).

Courts have concluded that "911 calls reporting an emergency can be enough to support warrantless searches under the exigent circumstances exception, particularly where, as here, the caller identified himself." *United States v. Richardson,* 208 F.3d 626, 630 (7th Cir. 2000). The

nature of police work requires that officers are able to respond promptly to reports of emergencies without unnecessarily second-guessing them. *Id.*

Plaintiff argues that Tumidalsky lacked the sufficient factual basis to reasonably believe that the missing boy was in Plaintiff's home. However, the record supports that Tumidalsky's belief was objectively reasonable. Prompted by a report from a police dispatcher, Tumidalsky responded to a 911 call placed by Ms. Cox where she alleged that a schizophrenic woman, Plaintiff, had taken her five-year-old son. While Tumidalsky did not have a warrant, there was a child in risk of danger which created an exigent circumstance. Ms. Cox insisted that she knew her son was in Plaintiff's home to both the dispatcher and Tumidalsky, and, in addition to telling both that Plaintiff was mentally impaired, she continually asserted her belief that her son was in present danger. The facts known by Tumidalsky formed a basis for a reasonable belief that, because a five-year-old boy was reportedly in present peril, immediate action was required. "Probable cause is only a probability or substantial chance of criminal activity, not a certainty that a crime was committed." *Beauchamp v. City of Noblesville, Ind.*, 320 F.3d 733, 743 (7th Cir. 2003). There is no evidence that Tumidalsky had reason to question Ms. Cox's claim, and it is not an officer's responsibility "to speculate or meditate on whether the report is correct." *Id.* (quoting *Wayne v. United States*, 318 F.2d 205, 212 (D.C. Cir. 1963)).

The manner of the officer's entry was also reasonable. Tumidalsky knocked and announced himself as a police officer, both before and after the dispatcher notified him that Plaintiff was indeed inside, and attempted to get Plaintiff to answer the door to no avail. Tumidalsky knocked at the side door, front door, and on the front windows for a total of at least six minutes and received no response. He then attempted to break only the glass pane of the side

door but ultimately had to kick down the door because the deadbolt was locked.

Tumidalsky's report, and the subsequent approval from Sergeant Thomas Strabavy to enter the residence, show that the police regarded the situation as an emergency due to a genuine threat of danger. Because the five-year-old boy was believed to be in immediate danger, procuring a warrant was not an option. Therefore, the warrantless entry falls within the exigent circumstances exception to the warrant requirement.

(b)  *Officers' Search*

While the entry falls within exigent circumstances, the search must also be justified by showing that it was "appropriately limited to the circumstances that justified it." *United States v. Salava*, 978 F.2d 320, 325 (7th Cir. 1992). Two officers, Tumidalsky and Gabriel Gutierrez, searched the home for about half an hour. Given the circumstances, such a time period appears to be reasonable. Plaintiff does not allege or present any facts demonstrating that the time spent by the police to search her house was unreasonable. Accordingly, no issue is found with the search under the exigent circumstances exception.

(c)  *Plaintiff's Seizure*

Plaintiff's next allegation is that she was illegally seized by Tumidalsky. The general rule is that "an official seizure of [a] person must be supported by probable cause, even if no formal arrest is made." *Mich. v. Summers*, 452 U.S. 692, 696 (1981). While Plaintiff does have a Fourth Amendment right to be free from all unreasonable seizures, circumstances can render a warrantless seizure reasonable. *Ill. v. McArthur*, 531 U.S. 326, 330 (2001). Courts have

recognized that the minimal intrusion of a brief detention, in comparison to law enforcement needs, may be reasonable under the circumstances. *Id*. This includes circumstances "involv[ing] a plausible claim of specially pressing or urgent law enforcement need, i.e., 'exigent circumstances.'" *Id.* The reasonableness of a seizure requires that "the necessary degree of confidence increases with the degree of intrusion." *United States v. Chaidez*, 919 F.2d 1193, 1197 (7th Cir. 1990). "[A] brief detention calls for reasonable suspicion" while "an arrest requires probable cause" and both are determined on the basis of the totality of the circumstances. *Id*. at 1197-98.

Unreasonable seizure cannot be found here as Plaintiff fails to sufficiently support her claim with facts and legal authority. Tumidalsky is not even named as the perpetrator of the alleged unreasonable seizure. Plaintiff's entire case rests upon a demonstration that the police lacked probable cause to enter her home and therefore the resulting seizure is also a violation of her rights. Since the entry is justified under the exigent circumstance exception, without additional factual support that the seizure itself was unreasonable, Tumidalsky is entitled to summary judgement. Even if Plaintiff had named Tumidalsky as the perpetrator, the facts before the Court do not support a claim of unlawful seizure.

To determine if Plaintiff was unlawfully seized, the Court must determine whether (1) Plaintiff was seized, and (2) if that seizure was reasonable under the totality of the circumstances. *Leaf v. Shelnutt*, 400 F.3d 1070, 1089 (7th Cir. 2005). "A person is seized . . . when the officer, by means of physical force or a show of authority, terminates or retrains [the person's] freedom of movement through means intentionally applied." *Brendlin v. Cal.*, 551 U.S. 249, 254 (2007) (internal quotations omitted). There is no question that Plaintiff was seized as,

without giving consent, she was physically grabbed by the police officers, handcuffed, and placed in a patrol car. The seizure must also be reasonable under the circumstances. "The degree of invasion of one's privacy is measured by a person's reasonable expectation of privacy and the process of the search and seizure." *United States v. Sechrist*, 640 F.2d 81, 86 (7th Cir. 1981). "[I]n justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion." *Terry v. Ohio*, 392 U.S. 1, 21 (1968). An objective standard must be used in assessing if "the facts available to the officer at the moment of the seizure or search warrant a man of reasonable caution in the belief that the action taken was appropriate." *Id.* at 22 (internal quotations ommitted.)

Officer Tumidalsky had been told both in a report from a dispatcher and from Ms. Cox at the scene of the exigent circumstance that a five-year-old boy was missing. He was told that Plaintiff, an allegedly schizophrenic individual who had been participating in bizarre behavior, had him in her house. From Plaintiff's 911 call and the dispatcher's following report, Tumidalsky knew that Plaintiff was in her home and was not responding to his knocking. The Court finds that these specific and articulable facts, of which Tumidalsky was aware, are sufficient to give rise to a reasonable suspicion justifying the brief detention of Plaintiff.

The intrusion was minimally invasive, limited to removing Plaintiff from the scene to allow the officers to search the house in order to determine Plaintiff's possible role in the disappearance of the boy. *See United States v. Stoneking*, 179 Fed. Appx. 388, 393–94 (7th Cir. 2006) (upholding a thirty minute detention of a suspect in order to determine his role in the manufacture of methamphetamine). The officers immediately began to search the house and

released Plaintiff as soon as the boy was found, satisfying their responsibility to "diligently pursue[] a means of investigation that was likely to confirm or dispel their suspicions quickly." *United States v. Sharpe*, 470 U.S. 675, 686 (1985). Additionally, the potential risk to officer safety—due to the reports of Plaintiff's bizzarre behavior and mental illness—and the need to ensure quick and orderly search for the missing boy further justified Plaintiff's restraint and removal from the scene. *See Mich. v. Summers*, 452 U.S. at 702-03. Plaintiff has presented no facts demonstrating that the duration and means of detention were unreasonable. Therefore, the Court finds that Plaintiff's seizure was reasonable in view of the totality of the circumstances.

(d) *Excessive Force*

"*[A]ll* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 395 (1989). This requires a balancing between the degree and type of intrusion and the interest of the government. *Id.* at 396. Factors to be considered include: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Id.* Reasonableness, an objective consideration, is determined by what a reasonable officer present at the scene would have thought, without regard to the added knowledge of hindsight. *Id.* at 396–97. Police officers must be granted latitude in making split-second judgments regarding appropriate degrees of force. *Id.* at 397.

Without even considering the degree of force used, Tumidalsky is entitled to summary

15

judgment. Plaintiff insists that she was forcibly removed from her home, thrown off her porch, thrown face down onto the ground, aggressively handcuffed, lifted from the ground and placed in a police car. She fails, however, to allege or establish any connection between Tumidalsky and these events. Instead, Plaintiff admits that she does not know which officers touched her.

Not only does she fail to present evidence of his active involvement, she also does not show that Tumidalsky passively stood by as an observer and took no action to prevent the use of excessive force. Without facts linking Tumidalsky to the offense, Plaintiff's allegations cannot defeat summary judgment.

### (4) *Liability of the City of Hammond*

Because no constitutional violation has been found in the entry, search, and seizure carried out by the police, the City of Hammond cannot be held liable. However, Plaintiff has created a genuine issue of fact as to whether the arresting officers used excessive force in seizing her. None of those officers, however, have been named personally as defendants. Therefore, if any recovery were to exist, it must be from the city. There, too, Plaintiff has failed to assert or establish the necessary means to find liability. She fails to show that a formal policy or widespread practice exists promoting the alleged violations of her constitutional rights. No evidence has been offered to suggest that this is more than an isolated occurrence. Likewise, Plaintiff identifies no policymaker who played a causal role in the events. Without establishing a policy, custom, or responsible policymaker, Plaintiff's suit against the municipality cannot defeat summary judgment.

**(5)** *State claims*

With the granting of summary judgment to Defendants concerning the federal claims raised by Plaintiff, original jurisdiction over the state claims no longer exists. Title 28 U.S.C. § 1367(c)(3) states, "The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if . . . the district court has dismissed all claims over which it has original jurisdiction." Accordingly, Plaintiff's remaining claims against the Defendants are dismissed for lack of jurisdiction. *Hopkins v. White*, 292 Fed. App. 497, 500 (7th Cir. 2008).

**D.** **Conclusion**

Defendants' Motions for Summary Judgment (DE 27, DE 29) are GRANTED.

SO ORDERED on July 22, 2010.

    S/ Joseph S. Van Bokkelen
JOSEPH S. VAN BOKKELEN
UNITED STATES DISTRICT JUDGE